# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAM MANNINO ENTERPRISES, LLC, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 3:14-6 |
| v. | ) ) | JUDGE KIM R. GIBSON |
| JOHN W. STONE OIL DISTRIBUTOR, LLC, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I. Introduction

This action arises from a dispute between Plaintiff Sam Mannino Enterprises, LLC ("Mannino" or "Plaintiff") and Defendant John W. Stone Oil Distributor, LLC ("Stone Oil" or "Defendant") concerning Stone Oil's leasing of certain railcars to Mannino. Plaintiff contends that Defendant is liable for breach of contract, tortious interference with a contractual relationship, and common law fraud. Defendant has filed a counterclaim for the recovery of certain charges allegedly due under the parties' lease agreements.

Presently pending before the Court is Defendant's Motion for Summary Judgment (ECF No. 30) in which Defendant moves that all of Plaintiff's claims be dismissed and moves for partial summary judgment on its counterclaim. For the reasons that follow, the motions at ECF No. 30 will be granted. This matter will be scheduled for trial regarding damages on Defendant's counterclaims.

## II. Jurisdiction and Venue

The Court has jurisdiction over all of the parties' claims pursuant to 28 U.S.C. §1332, as the parties are of diverse citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs. Venue is appropriate pursuant to 28 U.S.C. §28 U.S.C. §1391(b)(2).

## III. Factual and Procedural Background[1]

Stone Oil is a Louisiana limited liability company that is engaged in the business of, among other things, leasing cargo railcars to lessee companies. (Compl. ¶2, ECF No. 1-2; Answer and Countercl. ¶¶ 2 and 12, ECF No. 25; Decl. of Gordon Bent ¶2, ECF No. 31-1.) Mannino is a Pennsylvania Limited Liability Company doing business under the fictitious name "Investors First Capital." (Compl. ¶1, ECF No. 1-2; Answer and Countercl. ¶1, ECF No. 25.) Mannino is engaged in the business of leasing cargo railcars from entities like Stone Oil and then subleasing the railcars to entities that transport rail cargo. (See Pl.'s Br. Opp. Mot. Summ. J. at 2, ECF No. 34.)

Between October and December 2013, Stone Oil leased forty (40) railcars to Mannino on a month-to-month basis.[2] (SMF ¶1; see Def.'s Mot. to Dismiss, Ex. 1, 2 and 3,

---

[1] The court's recitation of the facts is taken partly from Stone Oil's Statement of Material Facts (ECF No.31, hereinafter, "SMF"). Because Mannino did not file a Responsive Concise Statement or otherwise respond to Stone Oil's SMF, the factual averments set forth in Defendant's SMF are deemed admitted for purposes of the pending motion, to the extent they are otherwise supported by the record. See LCvR 56(C)(1)(a) and 56(E). Where appropriate, the Court cites to other, uncontested portions of the record to supply the background facts of this case. See Fed. R. Civ. P. 56(c)(3). Unless otherwise indicated, the following facts are not genuinely disputed by the parties.

[2] The railcars in question were not actually owned by Stone Oil but, rather, were leased by Stone Oil from the true owners and then sublet to Mannino. (See Bent Decl. ¶¶ 12-13, ECF No. 31-1 at

ECF Nos. 11-3, 11-4, 11-5; Bent Decl. Ex. E, ECF No. 31-1 at pp. 56-62[3].) The December

lease covered a rental period "starting approximately 12/01/2013 and ending

approximately 12/31/2013." (Bent Decl. Ex. E, ECF No. 31-1, p. 56.) Under the lease, Stone

Oil "reserve[d] the right to end this agreement, and have all cars returned … with a 10

day notice." (Id.) On December 4, 2013, Mannino sent Stone Oil wired funds in the

amount of $124,000 in consideration of a lease for the forty railcars for the months of

December, 2013 and January, 2014. (Compl. ¶8; Answer and Countercl. ¶8.) Following

Stone Oil's receipt of this payment, the December Lease was re-conducted through

January, 2014; however, no written lease was signed for January, 2014. (SMF ¶4.)

In the meantime, on November 26, 2013, Mannino and Stone Oil had entered into

an agreement (hereinafter, the "Commission Agreement") that "contemplated a

relationship in which [Mannino would] facilitate a Sub-lease transaction or transactions

involving 40 or more tank railcars" directly between Stone Oil and an end user/lessee.

(SMF ¶6; Compl. Ex. 1, "Recitals" Clause, ECF No. 1-2.) According to the "Recital"

clauses in the Commission Agreement, Mannino "[had] identified an investment grade

Lessee who seeks to lease the tank railcars from [Stone Oil] at a monthly lease payment of

nineteen-hundred ($1,900.00) dollars per car…" (Compl. Ex. 1, ECF No. 1-2.) The

agreement provided that Stone Oil would pay Mannino "four hundred ($400.00) dollars

per month for each tank railcar leased to the Lessee for the term of the lease and any lease

---

pp. 3-4.) For the sake of simplicity and to avoid confusion, the Court will refer to the transaction
between the parties as a "lease" rather than a "sublease."

[3] Page citations in Document No. 31-1 refer to the official CM/ECF pagination appearing in the
header of the document.

renewals thereafter." (*Id.* ¶1.) Further, these commission payments would be made "within five (5) days of the date that the payment was received by [Stone Oil] from the Lessee." (*Id.* ¶2.)

According to Stone Oil, the terms of the Commission Agreement "contemplated that the existing month-to-month lease of the 40 railcars by Mannino would change to an arrangement whereby Stone Oil would lease the 40 railcars directly to an end user, with Mannino simply pocketing a commission as the broker. Under this contemplated arrangement, Mannino would no longer be the lessee of the railcars." (Def.'s Mem. Supp. Mot. Summ. J. 3-4, ECF No. 32.) Stone Oil claims that it entered into the Commission Agreement based on representations by Mannino that it would broker leases for Stone Oil's railcars to Procter & Gamble for the price of $1,900 per railcar per month. (*See* Bent Decl. ¶8, ECF No. 31-1 at p. 2; Def.'s Pet. for Decl. Action, Bent Decl. Ex. A, ECF No. 31-1 at p. 6).) Matters between the parties later deteriorated when Mannino sought to effectuate a leasing arrangement with a different sub-lessee, Associated Energy Services ("AES").

On December 18, 2013, Stone Oil's agent, Gordon Bent, sent correspondence to Mannino giving notice that Stone Oil was terminating the November 26, 2013 Commission Agreement. The letter stated:

> Stone entered this Agreement under the representation made by you that Procter & Gamble Corporation would be the lessee who rented the tank railcars, but this did not occur. The creditworthiness of a major corporation like Procter & Gamble Corporation was the motivating reason for Stone entering the Agreement, and the offers by you for alternative lessees without similar creditworthiness are not the same, so Stone prefers not to pursue this further.

(Def.'s Mot. to Dismiss. Ex. 4, ECF No. 11-6.)

Bent's correspondence further advised that Stone Oil would not renew its leasing arrangement with Mannino beyond January 2014:

> [P]lease be advised that we have accepted the payment of rent from you to re-conduct the attached [December lease], for one month, the month of January 2014, and that notice is furnished that all railcars should be returned to Stone at the expiration of the Lease on January 31, 2014. No further lease will be made after that date. A delivery address for the return of the railcars will be promptly furnished.

(Def.'s Mot. to Dismiss. Ex. 4, ECF No. 11-6.)

The following day, December 19, 2013, Stone Oil filed a state court declaratory judgment action in Jefferson Parish, Louisiana. (Compl. ¶12; Answer and Countercl. ¶12.) In its petition, Stone Oil sought a declaration that "all agreements between [Stone Oil and Mannino] are terminated effective January 31, 2014, and that no sums are due by John W. Stone Oil Distributors, LLC to Mannino Enterprises, LLC…" (Bent Decl. Ex. A, ECF No. 31-1, p.7; *see* SMF ¶¶12-13.) Immediately after commencing the Louisiana action, Stone Oil furnished a copy of the petition to Mannino's attorney. (SMF ¶14; Def.'s Mot. to Dismiss Ex. 6, ECF No. 11-8.)

Despite this notice, Mannino apparently failed to defend the Louisiana action. Consequently, a default judgment was entered against Mannino on March 24, 2014. In relevant part, the judgment declared:

1. That the Agreement made November 26, 2013 between John W. Stone Oil Distributor, LLC and Sam Mannino Enterprises, LLC (d/b/a Investors First Capital) for the lease of 40 railroad tank cars terminated effective January 31, 2014 and that no sums are due or owed by John W. Stone Oil Distributor, LLC to Sam Mannino Enterprises, LLC under the Agreement, or for any breach thereof;

2. That the Agreement to lease railcars dated September 9, 2013 for the lease term beginning December 1, 2013 and ending December 31, 2013, as re-conducted and extended through January 31, 2014, by John W. Stone Oil Distributor, LLC, as lessor, in favor of Sam Mannino Enterprises, LLC (d/b/a Investors First Capital), as lessee, covering 40 railcars terminated effective January 31, 2014 and that no sums or damages are due by John W. Stone Oil Distributor, LLC to Sam Mannino Enterprises, LLC under the Lease, or for any breach thereof;

3. That John W. Stone Oil Distributor, LLC did not breach either of the aforesaid agreements with Sam Mannino Enterprises, LLC and owes no further obligations or sums to Sam Mannino Enterprises, LLC thereunder…

(Bent Decl. Ex. B, ECF No. 31-1 at pp. 14-15.)

In the meantime, Gordon Bent had spoken with a representative of AES by telephone on December 20, 2013. During this conversation, Bent advised AES's representative that the railcar lease with Sam Mannino Enterprises, LLC would not be renewed after January 31, 2014. (Bent Decl. ¶4, ECF No. 31-1, p. 1.)

Mannino filed the instant lawsuit against Stone Oil in the Court of Common Pleas of Blair County, Pennsylvania on December 27, 2013. In its complaint, Mannino asserted claims for breach of contract, tortious interference with a contractual relationship, and common law fraud. Stone Oil removed the case to this Court on January 10, 2014. (*See* Notice of Removal, ECF No. 1.)

Plaintiff's first claim is premised upon Stone Oil's alleged breach of the November 26, 2013 Commission Agreement. According to Plaintiff, the "essence" of that agreement was that forty or more railcars would be leased to an "investment grade" company in exchange for a monthly fee of $1,500. (Compl. ¶ 5.) Plaintiff alleges that, based on the terms of the agreement and certain representations made by Bent, it believed it "had the

capacity to enter into a contract with Associated Energy Services … or any investment grade company for the leasing of up to sixty railcars for a period of time through March 2014." (Id. ¶6; *see* id. ¶¶ 14-16, 20-22.) To that end, "Plaintiff sent and Defendant accepted wired funds in the amount of $124,000 in consideration of a lease for forty railcars for the months of December[ ] 2013, and January 2014" (*Id*. ¶8), and those railcars were then sublet by Mannino to AES. In addition, Plaintiff entered into a sublease with AES for an additional twenty (20) railcars, for which Plaintiff accepted payment and wired $31,000 to Stone Oil on December 6, 2013. (*Id*. ¶¶ 9-10, 18, 22.)[4] Plaintiff claims that Stone Oil breached the Commission Agreement through its efforts to retrieve the forty leased railcars and by failing to provide the additional twenty railcars for which Stone Oil received advanced payment. (*Id*. ¶24.) It seeks a court order requiring specific performance of the Commission Agreement or, alternatively, damages in the amount of $96,000, representing its anticipated profits under the Commission Agreement. (Id. ¶25 and Ad Damnum Clause.)

In Count II of the complaint, Plaintiff alleges tortious interference with a contractual relationship based on Bent's December 20, 2013 communication with a representative of AES. According to the complaint,

> Defendant on the aforementioned date[ ] intentionally made a tortious statement to Associated Energy by telling them that Plaintiff did not have the Authority to sublease to them. This statement was made for the purpose of interfering with the existing contract between Plaintiff and Associated Energy. It is also believed that Defendant is trying to lease the same cars to another company at an increased price.

---

[4] Elsewhere in the complaint, Plaintiff alleges that it wired $62,000 to Stone Oil on December 6, 2013. (Compl. ¶22.) For present purposes, the discrepancy is not material.

(Compl. ¶28.) Plaintiff claims that it has had "an extensive history of successful business dealings with Associated Energy and Defendant's action(s) has severely strained the working relationship between Plaintiff and Associated Energy." (*Id*. ¶29.) In addition, "Associated Energy has demanded immediate reimbursement from Plaintiff for railcars they have paid for, but not received." (*Id*. ¶30.)

Count III of the complaint asserts a claim for common law fraud. This claim is based on Defendant's purported representation that it had twenty additional railcars that it was willing to lease to Plaintiff, which then allegedly induced Plaintiff to contract with AES for the subleasing of the additional twenty cars, accept payment for the railcars from AES, and forward the payment to Stone Oil. (Compl. ¶¶ 33-36.) Despite having accepted payment for the 20 railcars, Stone Oil has refused to either produce the cars or refund the payment. (*Id*. ¶34.)

Stone Oil admits that it is currently holding Mannino's lease payment for the twenty additional railcars[5] with no intention of providing the railcars; however, it maintains that it is entitled to do so as an offset to "empty mileage" fees[6] that Mannino

---

[5] In its counterclaim, Stone Oil avers that the amount of the deposit it is holding is $28,000 (Countercl. ¶6) rather than $31,000, as alleged by Plaintiff. (Compl. ¶18.) Once again, the Court views this discrepancy as immaterial for present purposes.

[6] As set forth in the uncontested declaration of Gordon Bent, an "empty mileage fee" is a fee charged to the owner of the railcars by the railroad over which the cars are travelling. (Bent Decl. ¶11, ECF No. 31-1 at p. 3.) Railroads typically charge the railcar owner for the mileage that is travelled by loaded railcars; however, railroads do not generally charge for the mileage that is travelled by empty railcars, unless the empty cars travel in excess of 106% of the mileage covered by the loaded railcars. (*Id*.) Thus, railroads typically allow a 6% safe harbor in order to accommodate a limited amount of excess "empty mileage." (Id.) Once this 6% safe harbor is exceeded, an "empty mileage fee" is charged. (*Id*.)

incurred under the various lease agreements.  (Compl. ¶18; Answer and Countercl. ¶18; *see also* Answer and Countercl., "Affirmative Defenses" ¶1; Countercl. ¶5.)  According to Stone Oil, these charges were incurred when "Mannino had the railcars routed around the country while … pursuing potential customers."  (Def.'s Countercl. ¶5.)  Stone Oil contends that it is entitled to reimbursement for these empty mileage charges under the terms of the various leases.  (Id. ¶¶3, 5.)

Following a period of discovery, Stone Oil filed the pending motion for summary judgment (ECF No. 30), together with its supporting brief (ECF No. 32) and Concise Statement of Material Facts (ECF No. 31), on November 12, 2014.  Mannino filed its brief in opposition to the Defendant's motion (ECF No. 34) on January 2, 2015.  Thereafter, Stone Oil filed its reply brief (ECF No. 35).

Stone Oil seeks judgment on all of Mannino's claims based on the judgment previously entered in the Louisiana state court declaratory action.  Secondarily, Stone Oil argues that Mannino has failed to adduce evidence in support of each of its claims.  Finally, Stone Oil contends that it is entitled to partial summary judgment on its counterclaim for recovery of empty mileage charges.  Based on the filings of record and the parties' respective briefs, the Court finds that the issues raised in Defendant's motion have been sufficiently joined and the pending motion is ripe for disposition.

### IV. Standard of Review

Summary judgment is appropriate only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R.

CIV. P. 56(a); *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir.2010). Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir.2005). Material facts are those that will affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir.2009). "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (*quoting Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir.1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials of the ... pleading," but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 288, 232 (3d Cir.2001) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n. 11 (1986)) (ellipsis in the original). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient

evidence (not mere allegations) for a reasonable jury to find for the nonmovant."

*Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir.1993).

## V. Discussion

### A. Plaintiff's Claims

#### 1. Breach of Contract

Count I of the complaint is premised upon Stone Oil's alleged breach of the November 26, 2013 Commission Agreement.  Stone Oil argues that this claim is barred by the doctrine of *res judicata* because the matter was already litigated in the Louisiana state court declaratory judgment action.  Mannino denies that the Louisiana judgment has any preclusive effect.  Accordingly, the Court must determine as a threshold matter whether the prior Louisiana judgment bars Plaintiff's breach of contract claim.

Pursuant to the Full Faith and Credit Act, a federal court must give a state court judgment the same preclusive effect it would be given by the court that rendered the judgment.  28 U.S.C. §1738 (1988)[7]; *see Del. River Port Auth. v. Fraternal Order of Police*, 290 F.3d 567, 573 (3d Cir. 2002) ("A federal court looks to the law of the adjudicating state to determine its preclusive effect.") (*citing Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 357 (3d Cir.1999)).   Accordingly, this Court must afford the Louisiana judgment the same preclusive effect, if any, that Louisiana courts would give.

---

[7] Section 1738 implements the Full Faith and Credit Clause, U.S. Const. art. IV, and says in relevant part:

> [The records and judicial proceedings of any court of any State, Territory or Possession] shall have the same full faith and credit in every court within the United States and its Territories or Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

Under Louisiana's *res judicata* statute,[8] a subsequent action is precluded when the following elements are satisfied: (1) the judgment in the first action is valid; (2) that judgment is also final; (3) the parties are the same; (4) the cause or causes of action asserted in the second suit existed at the time of the final judgment in the first suit; and (5) the cause or causes of action in the second suit arose out of the same transaction or occurrence that was the subject matter of the first suit. *Penton v. Castellano*, Case No. 49,843-CA, --- So. 3d ---, 2015 WL 3875484, at *4 (La. Ct. App. 2015) (citation omitted). "Res judicata forecloses both the relitigation of matters that have not been litigated but should have been raised in the earlier suit (claim preclusion) and matters previously litigated and decided (issue preclusion)." *Id.*, at *5 (citation omitted). "The doctrine of res judicata is *stricti juris*, and any doubt concerning application of res judicata must be resolved against its application." *Id.*, at *4 (citation omitted). The party urging application bears the burden of proving the requisite elements by a preponderance of the evidence. *Id.* (citation omitted).

---

[8] Louisiana law on res judicata is set forth in LA. REV. STAT. ANN. §13:4231, which states:

> Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:
>
> (1) If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged in the judgment.
>
> (2) If the judgment is in favor of the defendant, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and the judgment bars a subsequent action on those causes of action.
>
> (3) A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that judgment.

Here, Mannino expressly concedes that elements (2) through (4) are present – that is, the Louisiana judgment is final, both the Louisiana action and this lawsuit involve the same identical parties, and the claims asserted by Plaintiff in this case existed at the time the Louisiana judgment was rendered. In addition, with regard to element (5), it is clear that Plaintiff's breach of contract claim arose out of the same transaction or occurrence that was the subject matter of the Louisiana litigation (*i.e.*, the Commission Agreement) and Plaintiff implicitly concedes as much. (*See* Pl.'s Br. Opp. Mot. Summ. J. 11, ECF No. 34 (arguing that "Mannino's claims – particularly the claims as to tortious interference and fraud … are only peripherally related to the claim that was the subject of the declaratory judgment action in Louisiana.").)

Nevertheless, Plaintiff contends that the doctrine of *res judicata* is inapplicable because the first element – the existence of a valid judgment – is not present. Specifically, Plaintiff argues that AES was an indispensable party to the Louisiana action and, because AES was not joined therein, the judgment rendered by the Louisiana court is null and void. *See Hernandez v. State, ex rel. Dep't of Transp. and Devel.*, 841 So. 2d 808, 817 (La. Ct. App. 2002) (joinder of interested parties is an indispensable prerequisite to the validity of a declaratory judgment).

When declaratory relief is sought under Louisiana law, "all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding." LA. CODE CIV. PROC. ANN. art. 1880. Issues as to indispensable parties are governed by Article 641 of the Louisiana Code of Civil Procedure, which provides that:

A person shall be joined as a party in the action when either:

(1) In his absence complete relief cannot be accorded among those already parties.

(2) He claims an interest relating to the subject matter of the action and is so situated that the adjudication of the action in his absence may either:

(a) As a practical matter, impair or impede his ability to protect that interest.
(b) Leave any of the persons already parties subject to a substantial risk of incurring multiple or inconsistent obligations.

LA. CODE CIV. PROC. ANN. art. 641.

"A person should be deemed needed for just adjudication only when absolutely necessary to protect substantial rights." *Branch v. Young,* 136 So. 3d 343, 350 (La. Ct. App. 2014) (citing *Indus. Cos., Inc. v. Durbin,* 837 So.2d 1207, 1217 (La. 2003)). In determining whether a party should be joined, the court should make a factual analysis of all the interests involved. *Id.* (citing *Gibbs v. Magnolia Living Ctr., Inc.,* 870 So.2d 1111, 1116 (La. Ct. App. 2004), *writ denied,* 877 So.2d 146).

Plaintiff argues that AES, "as a party to the sub-lease with Mannino and ultimate beneficiary of the leased rail cars, was an indispensable party to the declaratory judgment action filed by Stone. Having entered into a sub-lease with Mannino and having remitted payment for sixty (60) cars, Associated Energy had an absolute interest in the outcome of the litigation." (Pl.'s Br. Opp. Mot. Summ. J. 9, ECF no. 34.)

This Court does not agree. As Defendant points out, AES was not a party to either the November 26, 2013 Commission Agreement or the December, 2013 lease agreement between Stone Oil and Mannino that was re-conducted through January, 2014. These

were the only two contractual agreements at issue in the Louisiana declaratory judgment action. Moreover, there is no evidence of record establishing that the parties *mutually* intended that AES would be a third-party beneficiary of the Commission Agreement with contractual rights therein. Under a *stipulation pour autrui*, a contracting party may "stipulate a benefit for a third person," who must then "manifest[ ] his intention to avail himself of the benefit." LA. CIV. CODE. ANN. 1978.

The Louisiana Supreme Court has identified "three criteria for determining whether the contracting parties have provided a benefit to a third party: 1) the stipulation for a third party is manifestly clear; 2) there is certainty as to the benefit provided the third party; and 3) the benefit is not a mere incident of the contract between the promisor and the promissee." *Canal/Claiborne, Ltd. v. Stonehedge Devel., LLC,* 156 So. 3d 627, 633 (La. 2014). There is no evidence before the Court which could arguably satisfy these criteria.

Consequently, AES does not fit within the statutory definition of an indispensable party relative to the Louisiana declaratory judgment action. AES had no enforceable rights as to the contracts at issue in the Louisiana action because it was neither a party to those contracts nor in privity with either of the contracting parties. *See Lili Collections, LLC v. Terrebonne Parish Consol. Gov't,* --- So. 3d ---, 2015WL 3814537, at *2 (La. Ct. App. June 18, 2015) ("No right of action for breach of contract may lie in the absence of privity of contract between the parties.") Because AES had no enforceable rights under the two contracts at issue in the declaratory judgment action, AES's absence did not preclude the Louisiana court from affording the parties to that action complete relief. Nor can it be said that AES's absence from the Louisiana action left any of the parties thereto at

substantial risk of incurring multiple or inconsistent obligations. To the extent Mannino owes empty mileage charges to Stone Oil and also owes AES an obligation to return monies pre-paid by AES for the lease of the additional 20 railcars, these obligations are independent of one another and arise from separate agreements that Mannino entered into with parties not in privity to each other.

AES also did not become an indispensable party to the Louisiana litigation simply by virtue of its sub-lease with Mannino. To be sure, AES's sublease with Mannino may have resulted in AES having a pecuniary interest in the Louisiana court's adjudication of the parties' respective rights and obligations under the Commission Agreement; however, there is no evidence to suggest that AES's sublease with Mannino could have given AES legal rights under the Commission Agreement or the December, 2013 lease agreement between Stone Oil and Mannino. *See Canal/Claiborne, Ltd.,* 156 So. 3d. at 632-33 (sublease of certain real property constituted a new contract that was separate and distinct from the original lease between the sublessor and the property owner; there was no privity of contract between sublessee and property owner). In sum, AES had no legal interests that were directly adjudicated or affected by the Louisiana action, and AES's absence from that lawsuit did not impair or impede its ability to protect any legal interests it had under its sublease with Mannino. Accordingly, the Court concludes that AES was not an indispensable party to the Louisiana action, and the doctrine of *res judicata* therefore bars Plaintiff from prosecuting its breach of contract claim in this case.

Plaintiff nevertheless contends that its breach of contract claim is not barred by the Louisiana judgment because that judgment, by its terms, declares that the November 26,

2013 Commission Agreement terminated "effective January 31, 2014." Plaintiff maintains that, prior to January 31, 2014, and while the agreement was still in effect, Stone Oil breached its duty of good faith and fair dealing under the agreement by unilaterally contacting AES and/or by allegedly "stringing Plaintiff along" when it lacked any intention of honoring the sublease between Mannino and AES. Relatedly, Plaintiff posits that Stone Oil breached the Commission Agreement's "confidentiality" clause by unilaterally contacting AES without Plaintiff's consent.

This line of argument is unavailing for several reasons. First, these are not the breach of contract theories that Plaintiff actually pled in its complaint. (*See* Compl. ¶24 (alleging that "Defendant is in Breach of Contract by attempting to retrieve the leased railcars, and failing to provide the additional twenty railcars for which they have been paid in advance").) Second, these newly asserted breach of contract theories arise out of the same transaction that served as the subject matter of the Louisiana litigation and, because they could have been (but were not) asserted in that litigation, they are now barred by the doctrine of *res judicata*. *See* LA. REV. STAT. ANN. §13:4231; *Penton,* 2015 WL 3875484, at *4. Third, Plaintiff has failed to supply evidence establishing that Stone Oil "strung it along" in derogation of Stone Oil's contractual duty of good faith and fair dealing.[9] Fourth, Plaintiff has failed to demonstrate how it was injured by Stone Oil's alleged violation of the confidentiality clause, especially in light of the Louisiana court's

_____

[9] Although Plaintiff cites to "Exhibit 13" in support of its allegation, the Court has been unable to locate this exhibit in the record. (*See* Pl.'s Br. Opp. Mot. Summ. J. at 13, ECF No.34 (citing "Plaintiff's Exhibit '13'" in support of its argument that "Stone further breached its duty of good faith and fair dealing by stringing Mannino along when it apparently had no intention of honoring a sub-lease between Mannino and Associated Energy").)

ruling that Stone Oil had no obligation to supply railcars beyond the forty that were leased to Mannino (and sublet by Mannino to AES) through January 31, 2014. Finally, assuming Plaintiff could establish that a breach of the Commission Agreement occurred prior to January 31, 2014, its prayer for relief – *i.e.*, Plaintiff's request that Defendant be required to supply the additional twenty railcars and/or that it pay Plaintiff its anticipated profits under the Commission Agreement – is in direct conflict with the Louisiana court's declaration that Stone Oil owes no further obligation to Mannino under the Agreement and is not liable for any sums under the Agreement. (Bent Decl. Ex. B, ECF No. 31-1 at pp. 14-15.)

Even if *res judicata* did not bar Plaintiff's breach of contract claim, the Court would still conclude that the claim fails as a matter of law. To state a claim for breach of contract under Pennsylvania law,[10] the plaintiff must show: (1) the existence of a contract, (2) the breach of a duty imposed by the contract, and (3) damages. *Stein v. Magarity*, 102 A.3d 1010, 1013-14 (Pa. Super. Ct. 2014). To the extent Mannino seeks specific performance in the form of a court order "restor[ing] the lease on the sixty railcars" (Compl. Ad Damnum Clause), the record here does not support such relief because Mannino has not established any duty on the part of Stone Oil under the Commission Agreement to lease sixty railcars, either to Mannino or to AES. Under the clear and unambiguous terms of the December

---

[10] The Court notes that, under the Commission Agreement:

> [t]he formation, operation, and performance of [the] Agreement shall be governed, construed, performed, and enforced in accordance with the substantive laws of either [Pennsylvania or Louisiana] without regard to its conflict of laws rules."

(Compl. Ex. 1 at ¶7, ECF No. 1-2.)

lease agreement, Stone Oil had an absolute right to recall the forty railcars it originally leased to Mannino upon ten days' notice, a condition which was clearly met. The Commission Agreement did not give Mannino any further rights in regards to the original forty railcars, nor did it confer upon Mannino an unconditional right to obtain twenty additional railcars from Stone Oil. To the extent the Commission Agreement references the potential subleasing of "40 or more tank railcars," it clearly contemplates an arrangement whereby Stone Oil would lease those railcars directly to an end user, not to Mannino. (Compl. Ex. 1, ECF No. 1-2.) It is undisputed that this never occurred.

Similarly, nothing in the Commission Agreement establishes an unconditional duty on the part of Stone Oil to lease sixty railcars to AES. Although the Commission Agreement references the existence of an intended "investment grade" end user/lessee, that entity is not identified in the agreement, and the term is therefore ambiguous. "Where the contract terms are ambiguous and susceptible of more than one reasonable interpretation, however, the court is free to receive extrinsic evidence, *i.e.*, parol evidence, to resolve the ambiguity." *Fortwangler v. W.C.A.B. (Quest Diagnostics)*, 113 A.3d 28, 34 (Pa. Commw. Ct. 2015) (citation and internal quotation marks omitted). Here, Stone Oil has produced uncontradicted evidence establishing that the intended "investment grade" end user was Procter & Gamble, not AES. (*See* Bent Decl. ¶8, ECF No. 31-1 at p. 2; Bent Decl. Ex. A, ECF No. 31-1, at p. 11.) There is no evidence before the Court that would support a contrary finding and, consequently, Plaintiff has not established that Stone Oil had a duty under the Commission Agreement to lease railcars to AES.

To the extent Plaintiff seeks an award of its expectation damages, this claim also fails as a matter of law. As Defendant correctly notes, no commission payment ever became due under the express terms of the Commission Agreement because, according to the Agreement, Mannino would be paid a commission only when "payment was received" by Stone Oil from an actual end-user lessee. Mannino's principal acknowledged in deposition that no lease was ever consummated between Stone Oil and an end user. (See Samuel P. Mannino Dep. at 20:12-17, ECF No. 31-2, at p. 6.) Because Stone Oil never actually received any payments from an end-user lessee, Mannino never earned the right to a commission payment under the terms of the agreement.

In light of the foregoing considerations, this Court finds that no genuinely disputed issue of material exists as to Plaintiff's breach of contract claim. Accordingly, summary judgment will be entered against Mannino as to Count I of the complaint.

### 2. Tortious Interference With a Contractual Relationship

In Count II of the complaint, Plaintiff asserts a claim for tortious interference with a contractual relationship. According to the complaint, Stone Oil interfered with a sublease agreement that existed between Mannino and AES when Bent made contact with AES's agent on December 20, 2014.

Defendant argues that Count II is barred by the doctrine of *res judicata* because the tortious interference claim could and should have been asserted in connection with the Louisiana litigation, but was not. In addition, Defendant contends that Mannino has failed to proffer evidence to support this claim. Plaintiff counters that the tortious interference

claim is only "peripherally" related to the subject matter of the Louisiana action and, therefore, is not barred by the Louisiana judgment. In addition, Plaintiff contends that the record supports the existence of genuine issues of material fact relative to each of the elements of its tortious interference claim.

Louisiana's *res judicata* statute bars any claim that existed at the time the first judgment was rendered if the claim in question arose out of the same "transaction or occurrence" that served as the subject matter of the first action. *See* LA. REV. STAT. ANN. §13:4231; *Penton,* 2015 WL 3875484, at *4. Relatedly, Louisiana's Code of Civil Procedure provides that a defendant "shall assert in a reconventional demand [i.e., counterclaim] all causes of action that he may have against the plaintiff that arise out of the transaction or occurrence that is the subject matter of the principal action." LA. CODE CIV. PROC. ANN. art. 1061.[11] The latter provision closely tracks the language of Federal Rule of Civil Procedure 13(a)(1), which defines a compulsory counterclaim as one that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed. R. Civ. P. 13(a)(1)(A). Thus, in determining whether a judgment in a prior action precludes a second action, "'the chief inquiry is whether the second action asserts a cause of action which arises out of the transaction or occurrence that was the subject matter of the first action.'" *North Am. Treatment Sys., Inc. v. Scottsdale Ins. Co.,* 943 So.2d 429, 439 (La. Ct. App. 2006) (quoting *Burguieres v. Pollingue,* 843 So. 2d1049, 1053 (La. 2003)).

---

[11] *See also* LA. CODE CIV. PROC. ANN. art. 425(a) (addressing "Preclusion by judgment" and stating that "[a] party shall assert all causes of action arising out of the transaction or occurrence that is the subject matter of the litigation").

The appellate courts of Louisiana have explained the "transaction or occurrence" concept in various ways. In *Hy-Octane Investments, Ltd. v. G&B Oil Prods., Inc.*, 702 So.2d 1057 (La. Ct. App. 1997), the court observed that:

> Black's Law Dictionary defines "transaction" as, inter alia, "a broader term than 'contract,' " and "a group of facts so connected together as to be referred to by a single legal name; as a crime, a contract, a wrong." Among the definitions of "transaction or occurrence" found in 42 Words and Phrases, Supp. p. 201 (1997), is "whether pertinent facts of different claims are so logically related that issues of judicial economy and fairness mandate that all issues be tried in one suit." The federal courts have given the words "transaction or occurrence" a broad and liberal interpretation in order to avoid a multiplicity of suits. All logically related events entitling a person to institute legal action against another generally are regarded as comprising a "transaction or occurrence." *Lasa Per L'Industria Del Marmo Soc. Per Azioni v. Alexander*, 414 F.2d 143 (6th Cir.1969).

702 So.2d at 1060.

In *North Am. Treatment Sys., Inc.*, 943 So. 2d 429, 440 (La. Ct. App. 2006), the court described the "basic methodology of the [res judicata] transactional analysis" as follows:

> (1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar [citations omitted], the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.

> (2) What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and *whether their treatment as a unit conforms to the parties' expectations or business understanding or usage*. (Emphasis supplied.)

Restatement (2nd) of Judgments § 24 (1982).

In its legal sense, a "transaction" has been defined as "[t]he act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract," "something performed or carried

out; a business agreement or exchange," or even "any activity involving two or more persons." Black's Law Dictionary 1535 (8th ed. 2004). An "occurrence" is understood to be "[s]omething that happens or takes place; specif., an accident, event, or continuing condition that results in personal injury or property damage that is neither expected nor intended from the standpoint of an insured party." *Id*. at 1109.

943 So.2d at 440.

In this case, the Court concludes that Plaintiff's claim for intentional interference with a contractual relationship arose from the same transaction or occurrence that served as the subject matter of the Louisiana declaratory judgment action. In the Louisiana case, the underlying "transactions" were: (a) the lease agreement between Stone Oil and Mannino for the leasing of forty railcars and (b) the Commission Agreement, which contemplated a future relationship whereby Mannino would broker a direct lease between Stone Oil and an end user/lessee. The "occurrence" which gave rise to the Louisiana litigation was Stone Oil's termination of both agreements, via Bent's December 18, 2013 correspondence, based on Mannino's efforts to substitute AES as the end-user of the subject railcars in lieu of Proctor & Gamble. After Mannino threatened a lawsuit, Stone Oil sought, and received, a judgment from the Louisiana court declaring, essentially, that it had properly terminated the agreements and owed no further sums or leasing obligations to Mannino. In Count II of the instant complaint, Mannino asserts a claim for tortious interference based on Bent's December 20 communication to AES that Stone Oil's lease of railcars to Mannino would not be renewed after January 31, 2014. Count II thus arises from Bent's contemporaneous communication of the very occurrence that gave rise to the Louisiana lawsuit. Furthermore, the injury which Plaintiff claims as a

result of Bent's communication is its inability to sublease additional railcars to AES beyond the forty that were subleased through the end of January 2014. Because Plaintiff's tortious interference claim arises from the same transaction and occurrence that was litigated in the Louisiana action, and because it was not asserted in that action, the claim is now barred.

Even if Count II was not barred by *res judicata*, however, summary judgment would still be appropriate because Plaintiff has failed to produce evidence supportive of the necessary elements of its claim. To maintain a successful claim for intentional interference with a contractual relationship, the plaintiff must establish: (1) the existence of a contractual relationship between the itself and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of the defendant's conduct. *Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 98 (Pa. Super. Ct. 2009), *aff'd* 20 A.3d 468 (Pa. 2011).

Here, Plaintiff has failed to establish actual interference with a contractual relationship. At bottom, the alleged "tortious interference" concerns Stone Oil's unwillingness to supply twenty additional railcars to Mannino prior to January 31, 2014 and/or its unwillingness to supply any railcars thereafter. Mannino claims that Stone Oil's conduct interfered with its existing sublease agreement(s) with AES. Mannino has not

provided a copy of the subject sublease(s) between itself and AES[12]; however, Mannino admits that, by its terms, its agreement with AES for the subleasing of the forty railcars terminated on December 31, 2013. (*See* Pl.'s Br. Opp. Mot. Summ. J. at 2-3, ECF No. 34 ("Mannino entered into a sub-lease with Associated Energy Services, LP … for the lease of the same forty (40) rail cars leased from Stone, for a term that ran until the end of December 2013."); s*ee id.* at 4 ("On December 3,2013, Mannino entered into a sub-lease with Associated Energy for the forty (40) cars leased from Stone, which lease ran until the end of December.").) Because Stone Oil's conduct did not interfere with Mannino's ability to sublease the forty railcars to AES through the end of December, 2013, Mannino cannot establish actual interference with the subject contract, nor can it show actual injury as a result of the alleged interference.

To the extent Mannino is claiming that Stone Oil interfered with its ability to sublease twenty additional railcars to AES, the claim at Count II still fails as a matter of law. At most, Stone Oil's conduct interfered with Mannino's ability to obtain twenty additional railcars *from Stone Oil;* however, Mannino has not established that it had an unconditional right to lease twenty additional railcars from Stone Oil. The December 2013 lease agreement references only Stone Oil's agreement to lease forty railcars. (*See* Bent. Decl. Ex. E, ECF No. 31-1 at p. 56.) Although Plaintiff alleged in its complaint that Stone Oil agreed on December 6, 2013 to lease an additional twenty railcars (*see* Compl. ¶), Plaintiff has failed to come forward with evidence that could establish a modification of

---

[12] Plaintiff seeks to establish the existence of the sublease by judicial admission and by reference to Plaintiff's "Exhibit 14." The Court has not been able to locate the referenced exhibit in the record.

the December, 2013 lease agreement as alleged in the complaint. Plaintiff's unsupported allegations are insufficient at this stage of the proceedings. *See Transamerica Occidental Life Ins. Co. v. Total Sys. Inc.*, 513 F. App'x 246, 249 (3d Cir. 2013) ("a nonmoving party may not rely on 'unsupported allegations in his memorand[a] and pleadings ... to repel summary judgment'") (quoting *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990)) (alteration and ellipsis in the original). Thus, the Court finds as a matter of law that the December, 2013 lease agreement did not confer upon Mannino an unconditional right to obtain twenty additional railcars from Stone Oil. Similarly, the Commission Agreement did not confer upon Mannino an unconditional right to obtain twenty additional railcars from Stone Oil. As the Court noted in its discussion of Count I, the Commission Agreement contemplated a future arrangement whereby Stone Oil would lease railcars directly to an end user (not to Mannino), and this never came to pass.

In light of the foregoing, Mannino has failed to establish any right or entitlement to obtain additional railcars from Stone Oil beyond the forty railcars that were leased to it through the end of January, 2014. It follows as a matter of law that Stone Oil's conduct vis-à-vis AES did not constitute tortious interference with Mannino's contractual relationship or result in actionable injury to Mannino.

### 3. Common Law Fraud

Plaintiff's third cause of action is for fraud. The basis for this claim is Stone Oil's alleged representation to Mannino that "it had twenty additional railcars it was willing to lease to Plaintiff." (Compl. ¶33.) Plaintiff avers that Defendant accepted payment for the

additional railcars but refused to produce the railcars or refund the money. (*Id*. ¶34.) Plaintiff further claims that it detrimentally relied on Defendant's misrepresentations by entering into a sublease with AES for the additional twenty railcars. (*Id*. ¶35.) Stone Oil claims that this cause of action, like the others, is barred by the Louisiana judgment and is otherwise unsupported by the evidence of record.

The Court agrees that Count III is barred by the Louisiana judgment. As noted, the "chief inquiry" for *res judicata* purposes is "whether the second action asserts a cause of action which arises out of the transaction or occurrence that was the subject matter of the first action." *North Am. Treatment Sys., Inc.*, 943 So.2d at 439 (internal quotation marks and citation omitted). Here, Plaintiff's fraud claim arises from Stone Oil's refusal to provide twenty additional railcars to Mannino, despite Stone Oil's alleged representation that it would lease the additional railcars under the same terms that applied to the original forty. (Compl. ¶¶ 6, 9, 33-34.) Plaintiff's fraud claim clearly arises from the same transaction and course of dealing that formed the basis of the Louisiana action. Because the claim was not asserted in that litigation, it cannot be prosecuted now.

In addition, Plaintiff's fraud claim is unsupported by the evidence of record. In Pennsylvania, common law fraud involves six elements: "1) a representation; 2) which is material to the transaction at hand; 3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; 4) with the intent of misleading another into relying on it; 5) justifiable reliance on the misrepresentation; and 6) the resulting injury was proximately caused by the reliance." *Gibbs v. Ernst*, 647 A.2d 882 (Pa. 1994). Here, Plaintiff has failed to present any evidence to support its allegation that Stone Oil made

materially false representations which Plaintiff relied upon to its detriment. Although Plaintiff purports to cite to "Exhibit '13'" in support of its fraud claim (*see* Pl.'s Br. Opp. Mot. Summ. J. at 14, ECF No. 34), the Court is unable to find any such exhibit in the record at hand. Consequently, Plaintiff has offered nothing more than unsupported allegations of fraud, which, as the Court has already noted, are insufficient as a matter of law at the summary judgment stage. *See Kimbleton v. White*, --- F. App'x, ----, No. 14–4001, 2015 WL 1941354, at *2 (3d Cir. Apr. 30, 2015) (the party opposing summary judgment must present more than just "mere allegations, general denials, or ... vague statements" to show the existence of a genuine issue of material fact) (*citing Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.1991)). Furthermore, in the absence of some evidence establishing the nature of the allegedly false representation(s), no basis exists from which a factfinder could reasonably infer that Plaintiff's detrimental reliance on the allegedly false representation was justifiable. Accordingly, summary judgment will be entered at Count III of the complaint.

### B. Defendant's Counterclaim for Recovery of Empty Mileage Charges

As noted, Defendant has asserted a counterclaim for the recovery of "empty mileage" charges. As set forth in the declaration of Gordon Bent, Rampart Range Corporation, one of the true owners of the railcars in question, issued an invoice to Stone Oil for "empty mileage" charges that were incurred on the railcars leased to Mannino during the months of October, November, and December, 2013. (Bent Decl. ¶12.) According to Bent, $66,889.00 of these charges are attributable to Mannino's use of the

railcars. (Id.) Another one of the true owners of the railcars, GATX Corporation, similarly issued an invoice to Stone Oil for "empty mileage" charges incurred on the railcars leased to Mannino during the same period. (*Id*. ¶13.) According to Bent, $15,430 of these charges are attributable to Mannino's use of the railcars. (*Id*.) Stone Oil has paid these charges and now seeks to recover the foregoing amounts from Mannino. (Id. ¶¶ 12-13.) Bent asserts that Mannino has also incurred additional "empty mileage" charges for which Stone Oil has not, as yet, received invoices. (*Id*. ¶14.)

The Court finds that no genuine issue of material fact exists as to Stone Oil's counterclaim for reimbursement of the "empty mileage" charges incurred by Mannino. Each of the sublease agreements between Stone Oil and Mannino contains a clause providing that: "Stone reserves [the] right to charge for empty mileage during Trip lease period." (Def.'s Mot. to Dismiss Ex. 1 at p. 2, ECF No. 11-3; Mot. to Dismiss Ex. 2 at p. 2, ECF No. 11-4; Bent Decl. Ex. E, ECF No. 31-1 at p. 56.) Mannino's principal admitted during deposition that, pursuant to this language, Mannino agreed to be responsible for the empty mileage charges it incurred. (Mannino Dep. at 13:1-7, ECF No. 31-2.) Furthermore, Mannino does not deny that it incurred the charges outlined in Bent's declaration. (*See* Pl.'s Br. Opp. Mot. Summ. J. at 14, 15 (claiming that the "empty mileage" charges it incurred and for which it is now responsible are a form of Plaintiff's "damages")). In fact, Plaintiff's only defense is that it should not have to pay the empty mileage charges it incurred because Stone Oil's alleged tortious conduct and breach of the Commission Agreement are the but-for cause of those charges. Plaintiff thereby acknowledges that resolution of Stone Oil's claim for empty mileage expenses is "wholly

dependent on and subsidiary to the resolution of [Plaintiff's own] claims." (Pl.'s Br. Opp. Mot. Summ. J. at 15.) Because those claims are being resolved adversely to Plaintiff, it has failed to establish any valid defense to Stone Oil's counterclaim.

**VI. Conclusion**

For the reasons stated above, Defendant's motion for summary judgment will be granted as to all claims in the complaint. In addition, Defendant's motion for partial summary judgment will be granted as to its counterclaim for recovery of empty mileage charges.

An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SAM MANNINO ENTERPRISES, LLC,** | ) ) ) | |
| **Plaintiff,** | ) ) | **CIVIL ACTION NO. 3:14-6** |
| **v.** | ) ) | **JUDGE KIM R. GIBSON** |
| **JOHN W. STONE OIL DISTRIBUTOR, LLC,** | ) ) ) | |
| **Defendant.** | ) | |

## ORDER OF COURT

**AND NOW,** this **31st** day of August, 2015, upon consideration of Defendant's

Motion for Summary Judgment (ECF No. 30), and in accordance with the accompanying

Memorandum Opinion,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment is

**GRANTED** as to all counts in the Complaint. Judgment will be entered in favor of

Defendant, and against Plaintiff, accordingly.

**IT IS FURTHER ORDERED** that Defendant's motion for partial summary

judgment on its counterclaim is **GRANTED,** and Plaintiff shall be liable to Defendant for

all "empty mileage" charges incurred by Plaintiff under the lease agreements between the

two parties, in a precise amount to be determined at trial.

BY THE COURT:

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE